UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERLEY INDUSTRIES, INC., d/b/a/ : <br> ULTRA ELECTRONICS HERLEY : <br> Plaintiff, : <br> v. : <br> : <br> R CUBED ENGINEERING, LLC : <br> Defendant. : | No. 5:20-cv-02888 |

**O P I N I O N**
Motion for Preliminary Injunction, ECF No. 6 – Denied without prejudice
Motion for Expedited Discovery, ECF No. 7 – Denied

**Joseph F. Leeson, Jr.**                                                            **November 5, 2020**
**United States District Judge**

**I.     INTRODUCTION**

Plaintiff Herley Industries, Inc. ("Herley") filed suit against Defendant R Cubed Engineering ("R3E"), stemming from a contractual relationship between the two parties formed for the purpose of developing and selling avionics surveillance equipment. Herley alleged several claims sounding in breach of contract, conversion, and the Defend Trade Secrets Act (DTSA)/Pennsylvania Uniform Trade Secrets Act (PUTSA). The day after the Complaint was filed, Herley filed the present Motion for Preliminary Injunction, ECF No. 6, along with a Motion for Expedited Discovery, ECF No. 7.

Because Herley fails to show it would suffer irreparable harm in the absence of an injunction, the Motion for Preliminary Injunction is denied without a hearing and without prejudice.

Additionally, Herley has not shown good cause for expedited discovery. Therefore, the Motion for Expedited Discovery is denied as well.

## II. FINDINGS OF FACT

The findings of fact as set forth here consist of, in large part, allegations from Herley's Verified Complaint that are not disputed in R3E's response to the present motion. *See* Compl., ECF No. 1; Resp., ECF No. 19. Herley, a developer of flight instrumentation products, and R3E, a developer of aviation surveillance products, entered into a Memorandum of Agreement ("the Memo Agreement") on January 16, 2015. *See* Compl. ¶¶ 7-8, 12. The Memo Agreement was formed for the purpose of producing a "Micro-Identification – 'Friend or Foe' transponder/receiver" ("Micro-IFF"). *See id.* at ¶¶ 9, 12. At that time, the Navy was seeking to purchase the Micro-IFF and had put together a multi-phase plan for procuring the Micro-IFF. *See id.* at ¶ 9. Procurement involved three discrete phases, and the bid for Phase I had already been awarded to R3E when R3E and Herley entered into the Memo Agreement. *See id.* at ¶¶ 10-11.

After the parties entered into the Memo Agreement, R3E submitted its proposal for Phase II of the project to the Navy, listing Herley as the subcontractor, and was awarded the contract on April 18, 2016. *See id.* at ¶¶ 13-14. Following the Phase II award, Herley and R3E entered into a "Teaming Agreement," which provided that Herley, among other things, would do the following:

(i) support the Phase II proposal;
(ii) act as subcontractor in furtherance of the award resulting from the Phase II proposal;
(iii) perform the obligations specified for Herley, as subcontractor under any Phase II (or possible Phase III) award for the further development, manufacture, and evaluation of the Micro-IFF; and
(iv) manufacture the Micro-IFF to satisfy any contract with the Navy or any other military or any non-military purchaser of the Micro-IFF, whether or not there are any other resultant Program awards.

*Id.* at ¶ 16, Ex. A 1 ("Teaming Agreement").

The Teaming Agreement includes several provisions that deal directly with the rights of both parties with respect to confidential information during the term of the agreement and after its termination. *See id.* at ¶¶ 20-23. Section 9 states that "HERLEY and R3E shall be co-owners of all inventions, designs, specifications, products and manufacturing processes and procedures and works excluding trademarks ('Intellectual Property Rights') developed jointly by the Parties specifically for the Micro-IFF and related products." *Id.* at Ex. A 4, ECF No. 1-4. Accordingly, the joint ownership does not extend to technology that is developed independent of the Micro-IFF venture, otherwise known as "Background Technology." *See id.* Section 9 defines "Background Technology" as "any technology or related Intellectual Property Rights of either Party developed independent of the Micro-IFF and related products ('Background Technology')." *Id.* (emphasis added). Finally, Section 9 provides that Herley has the exclusive right to "file and obtain any patents, copyrights, trademarks, or other legal protections" with respect to the Micro-IFF. *See id.*

Section 8 of the agreement provides further protections for sensitive information. It defines Confidential Information as "information concerning the designs, products, manufacturing and other processes and procedures, finances and business plans and other non-public information of the other [party] (collectively, 'Confidential Information')." *Id.* Section 8 provides that upon termination of the Teaming Agreement, each party upon request "shall deliver to the other Party all Confidential Information acquired from the disclosing Party . . . ." *Id.*

Reading Sections 8 and 9 together, the Teaming Agreement contemplates that, upon request, each party is owed return of (1) Confidential Information and Background Technology exchanged during the term of the agreement that (2) was not related to the joint development of the Micro-IFF. These provisions were drafted to survive termination of the agreement. *See id.*

3
110520

In addition, Section 14 provides that equitable remedies are available for a breach of Sections 8 and 9. *See id.* at Ex. A 6-7.

Beginning on January 23, 2015, R3E issued four purchase orders to Herley related to the Phase II award with the Navy. *See id.* at ¶ 30. These orders were dated January 23, 2015, May 12, 2016, September 6, 2017, and January 3, 2018. *See id.* Herley completed the work on each order and submitted invoices to R3E for each. *See id.* at ¶ 32. R3E paid all four invoices in full without complaint. *See id.*

Around September 28, 2018, the United States Army awarded a contract for a Modular Data Acquisition System to R3E. *See id.* at ¶ 33. That Data Acquisition System would require the Micro-IFF that the parties were developing. *See id.* at ¶ 34. On October 25, 2018, R3E issued a fifth Purchase Order (PO-5) to Herley, stating that Herley would, "on a best efforts basis," support R3E in its contract with the Army. *See id.* at ¶ 34. PO-5 provided for a total invoice price of $377,092.32, to be paid in seven monthly installments of $53,870.00.[1] *See id.* at ¶ 35. Herley sent all seven invoices to R3E. *See id.* at ¶ 37.

During the period of March 27 to 29, 2019, Herley demonstrated a prototype of the Micro-IFF product to R3E. *See id.* at ¶ 35.[2] On May 17, 2019, R3E emailed Herley citing concerns about Herley's performance under PO-5 and the Teaming Agreement. *See id.* at ¶ 39. On October 4, 2019, R3E sent Herley a "Notice of Non Performance and Breach" under the

---

[1] According to Herley, the final invoice was for $53,872.32, which makes up the missing $2.32 between the installments and the total purchase order price. *See* Compl. ¶ 35 n.1.

[2] The parties dispute whether the demonstration was satisfactory. Herley claims that R3E was satisfied with the results of the demonstration. *See* Compl. ¶ 49. Notwithstanding, in its Sur-Reply to Herley's motion, R3E asserts that of the 13 working channels promised, "12 channels failed to function at all, and the only channel that functioned failed to produce a signal that could meet the minimum sensitivity or dynamic range requirements by more than a factor of one thousand (1,000)." Def.'s Sur-Reply 6, ECF No. 31 (citing Contarino Aff. ¶ 31, ECF No. 31-1).

terms of the Teaming Agreement. *See id.* at ¶ 40. Thereafter, on January 3, 2020, R3E sent a letter to Herley stating that the Teaming Agreement had been terminated for the reasons specified in the October 4 Notice. *See id.* at ¶ 43.

Following termination of the Teaming Agreement, PO-5 remained partially unpaid to Herley. *See id.* at ¶ 52. Herley only received payment for the first three invoices in the amount of $161,610, with $215,480 outstanding for the remaining four invoices. *See id.* at ¶ 53. On March 2, 2020, R3E told Herley that the Army rejected one invoice for nonperformance and instructed R3E to not submit any additional invoices on account of the work being insufficient. *See id.* at Ex. D, ECF No. 1-7. R3E also stated that no portion of the remaining funds from PO-5, invoices four through seven, were received by R3E. *See id.* Herley requested information from the Army Contracting Officer as to the disposition of the funds related to PO-5. *See id.* ¶¶ 59-60. On June 5, 2020, the Contracting Officer responded, stating that R3E submitted five of the seven invoices to the Army for Payment. *See id.* at ¶ 60. As of the date of the Complaint, Herley has only received payment from R3E for three of those five submitted invoices. *See id.* at ¶ 53

On May 1, 2020, Herley sent a letter to R3E demanding return of "Intellectual Property" (IP)[3] pursuant to Sections 8 and 9 of the Teaming Agreement. *See id.* at ¶ 70. Herley sent a second demand letter on May 6, 2020. *See id.* at ¶ 71. On May 10, 2020, R3E responded, stating that the IP was subject to "joint ownership" and was already in the "public domain."[4] *See*

---

[3] Herley uses the term IP to encompass a wide range of information, including "intellectual property, confidential business information and trade secrets." *See* Compl. at ¶ 17.

[4] R3E later explains in its Response and subsequent Sur-Reply to Herley's motion that "public domain" referred to Herley and R3E's joint presentation of the Micro-IFF technology at a Department of Defense AIMS conference in April of 2019. *See* Resp. 13; Def.'s Sur-Reply 7-8, ECF No. 31.

*id.* at ¶ 62. Herley sent a final demand on May 18, 2020, which R3E acknowledged it received but to which R3E did not respond substantively. *See id.* at ¶ 74. Herley seeks the return of the following items:

> (a) Engineering plans, drawings, designs and formulas relating to the Micro-IFF and the development of any prototypes of the Micro-IFF including, but not limited to, receiver architecture to address noise figure and channel to channel isolation;
> (b) Trade secrets, inventions, ideas, processes, computer source and object code, formulae, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques;
> (c) Information regarding the Micro-IFF or other products, business plans, budgets, financial statements, contracts, prices, supplier and customers;
> (d) Information regarding the skills and compensation of Herley's employees, contractors and other agents;
> (e) All 45TS and Mode test data identified in Attachment A to Exhibit F and provided to R3E on March 27, 2019 as well as all derivative work made from the March 2019 Prototype Tests data;
> (f) All documents and information at any time shared regarding the prototype demonstrated to R3E during the week of March 24-31, 2019 by Herley;
> (g) Herley's Background Technology provided to R3E in furtherance of the MicroIFF contracts

*Id.* at ¶ 79.

In its Complaint, Herley asserts nine separate counts against R3E:

(1) Preliminary Injunctive Relief;

(2) Permanent Injunctive Relief;

(3) Violation of the DTSA;

(4) Violation of the PUTSA;

(5) Conversion of IP;

(6) Breach of the Teaming Agreement;

(7) Breach of Purchase Order 5;

(8) Conversion of Monies under Purchase Order 5; and

(9) Unjust Enrichment

Herley's motion specifies only three claims under which it seeks preliminary injunctive relief. These are (1) the DTSA claim, (2) the PUTSA claim, and (3) the common law Conversion of IP claim.

## III. LEGAL STANDARDS

### A. Hearing on Preliminary Injunction

"The applicable Federal Rule does not make a hearing a prerequisite for ruling on a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990) (citing Fed. R. Civ. P. 65(a)). "While an evidentiary hearing is not always required before resolving a preliminary injunction, . . . 'where the motion turns on a disputed factual issue, an evidentiary hearing is ordinarily required.'" *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 324 (3d Cir. 2015) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 n.16 (3d Cir. 2004)). Circumstances where a hearing is not required include:

> [1] the movant is proceeding on a legal theory which cannot be sustained, because then there could be no showing of a likelihood of success on the merits . . .
> [2] the facts are undisputed and the relevant factual issues are resolved . . .
> [3] the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm.

*Bradley*, 910 F.2d at 1175-76 (footnote omitted).

### B. The Law Governing Preliminary Injunctions

"Rule 65 governs the issuance of a preliminary injunction." *Checker Cab Phila., Inc. v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 26471, *5 (E.D. Pa. Mar. 3, 2015). "A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994).

"In order to prove irreparable harm, the moving party must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Bioquell, Inc. v. Feinstein*, No. 10-2205, 2011 U.S. Dist. LEXIS 16081, at *15 (E.D. Pa. Feb. 14, 2011) (internal quotations omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Sampson v. Murrary*, 415 U.S. 61, 90 (1964) (quoting *Va. Petrol. Jobbers Assn. v. FPC*, 259 F.3d 921, 925 (D.C. Cir. 1958)); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (finding that the plaintiff, who argued that without a preliminary injunction its business will "be completely destroyed, its employees and jobs will be lost and its goodwill and business reputation will be ruined," did not show irreparable harm where facts did not support the harm claimed). Additionally, "the risk of irreparable harm must not be speculative." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000). Rather, an assertion of irreparable harm must be based on concrete evidence and cannot be sustained "on the basis of 'bald and conclusory' statements." *Cornette v. Graver*, No. 3:19-cv-219, 2020 WL 4059589, at *24 (W.D. Pa. July 20, 2020) (citing *Brown v. Beard*, No. 8-cv-26, 2008 WL 11344639, at *2 (W.D. Pa. Mar. 5, 2008)); *see also Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (stating the "moving party must make a 'clear showing of *immediate* irreparable harm'" (quoting *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989) (emphasis added by *Campbell Soup* court))).

"[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." *See In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982).

### C. Expedited Discovery – The Requirement of Showing Good Cause and Reasonableness

The Federal Rules of Civil Procedure contemplate that discovery will begin after the parties' Rule 26(f) meeting and offer no guidance on when it is appropriate for courts to authorize expedited and/or early discovery. *See* Fed. R. Civ. P. 26(d)(1). The Third Circuit Court of Appeals has not announced a standard, but district courts in the Third Circuit have applied two standards for evaluating such requests: (1) a more stringent injunctive relief standard, and (2) a "good cause" standard. *See Bath Auth., LLC v. Anzzi LLC*, No. 18-00834, 2018 U.S. Dist. LEXIS 179754, at *22 (E.D. Pa. Oct. 19, 2018). "The prevailing approach in this Circuit is to apply the 'good cause' or reasonableness standard to resolve motions for expedited discovery." *See id.* at *22-23. This standard "requires the party seeking discovery to show 'good cause' for its motion, such that the request is 'reasonable' in light of the relevant circumstances." *Kone Corp. v. Thyssenkrupp USA, Inc.*, No. 11-465-LPS-CJB, 2011 U.S. Dist. LEXIS 109518, at *10 (D. Del. Sept. 26, 2011). The court should consider: "(1) the timing and context of the discovery requests, including whether a preliminary injunction hearing has been scheduled; (2) the scope and purpose of the requests; and (3) the nature of the burden to the respondent." *See id.* at *11. "Where the requests are overly broad and extend beyond the needs of the preliminary injunction, leave should be denied." *Chubb INA Holdings, Inc. v. Chang*, No. 16-2354 (FLW)(DEA), 2016 U.S. Dist. LEXIS 82225, at *12 (D.N.J. June 24, 2016).

D. **Applicable Standards of Law to the Individual Claims**

1. **The Law Governing The Defend Trade Secrets Act (DTSA) & Pennsylvania Uniform Trade Secrets Act (PUTSA)**

The DTSA provides the owner of a trade secret a remedy when that trade secret is misappropriated. *See* 18 U.S.C. 1836(b)(1). In order to make out a claim under the DTSA, a plaintiff must show (1) that they own a trade secret and (2) that the defendant misappropriated the trade secret. *See Teva Pharmas. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 674 (E.D. Pa. 2018). Similarly, the PUTSA provides injunctive relief for "actual or threatened misappropriation" of trade secrets. *See* 12 Pa. Stat. § 5303.

Both the DTSA and PUTSA define "trade secret" the same way, providing four factors for putative trade secrets to be evaluated against:

(1) The owner used "reasonable means" to keep the information secret;

(2) The information derives actual or potential "independent economic value" from being secret;

(3) The information is not "readily ascertainable by proper means"; and

(4) Others, who cannot access the information, would derive "economic value from its disclosure or use." *See Teva Pharmas.*, 291 F. Supp. 3d at 675 (citing 18 U.S.C. § 1839(3)).

A plaintiff must identify the trade secret with enough particularity "as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade." *See Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 386 (M.D. Pa. 2019) (citing *Dow Chem. Can., Inc. v. HRD Corp.*, 909 F. Supp. 2d 340 (D. Del. 2012); *Synygy, Inc. v. ZS Assocs.*, No. 07-3536, 2013 WL 3716518, at *2 (E.D. Pa. July 15, 2013)).

Generally, "vague references to products and information will not suffice." *See id.* (citing *Synygy*, 2013 WL 3716518, at *2).

In addition to showing the existence of a trade secret, the claimant must also show that it was misappropriated. The standard for "misappropriation" applicable to the present case is identical under both the DTSA and PUTSA. *See* 18 U.S.C. § 1839(5)(B); 12 Pa. Stat. § 5302(2) (defining "Misappropriation"). Both define misappropriation as including "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(B); 12 Pa. Stat. § 5302(2) (defining "Misappropriation").

### 2. The Law Governing Claims for Conversion of Trade Secrets

To state a claim for conversion of a trade secret, a plaintiff must allege:

(1) That it owns the trade secret;

(2) The plaintiff communicated the secret to the defendant within a confidential relationship; and

(3) The defendant made use of the trade secret to the detriment or harm of the plaintiff.

*See Teva Pharmas.*, 291 F. Supp. 3d at 680 (citing *Am. Hearing Aid Assocs. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 705 (E.D. Pa. 2004)).

### IV. PRELIMINARY INJUNCTION ANALYSIS

Herley's motion specifies three claims under which it seeks preliminary injunctive relief. These are (1) the DTSA claim, (2) the PUTSA claim, and (3) the common law Conversion of IP claim. Herley's likelihood of success on the merits of these claims hinges on a factual dispute over ownership of putative trade secrets. Notwithstanding, even if this Court assumes,

*arguendo*, that Herley is likely to succeed on the merits of its claims, Herley fails to establish irreparable harm. Therefore, an injunction shall not issue.

**A. Likelihood of Success on the Merits**

In order to make out a claim under the DTSA, the PUTSA, or the tort of conversion, Herley must show (1) the existence of a trade secret, and (2) that it was improperly disclosed or used by R3E.

Herley must first set out a trade secret. In an effort to do so, Herley provides a list of information in its Verified Complaint, claiming the information therein constitutes Herley's trade secrets. This list is set out in full in the Findings of Fact section, *supra*. It is worth noting that the list has not been expanded upon or altered by Herley's subsequent briefs. Each of the factual items is evaluated below.

   **1. Items (b), (d), and (g)**

Items (b), (d), and (g) on the list are too generic to provide this Court—or any recipient of a preliminary injunction—with notice of what documents Herley asserts are protectable trade secrets. While item (b)[5] contains some categories of information that may be worthy of protection under the DTSA and PUTSA, the list is too generic to pass muster under *Dow Chemical*. *See Advanced Fluid Sys.*, 381 F. Supp. 3d at 386 (citing *Dow Chem.*, 909 F. Supp. 2d 340). Item (b)'s vagueness is clear in its use of the phrase "trade secrets" to describe what Herley seeks to protect as a trade secret. Without an indication of the actual documents that

---

[5] Item (b) states in full "Trade secrets, inventions, ideas, processes, computer source and object code, formulae, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques."

Herley seeks protection over, a list of broad categories of information does not afford this Court adequate information upon which a trade secrets evaluation may be conducted.[6]

Item (d),[7] which merely identifies "information" as the category to be protected, is similarly too vague to permit a finding by this Court that the contents are trade secrets. As was the case with item (b), item (d) does not provide enough detail to afford this Court the opportunity to adjudicate its status as a trade secret. Part of the trade secret analysis involves assessing the degree to which the information is otherwise generally known within the trade. *See Advanced Fluid Sys.,* 381 F. Supp. 3d at 386. As to item (d), Herley makes no effort to specify (1) that the information regarding its employees is *entirely* unknown to *any* member of the industry or (2) how this Court should go about separating what portion of item (d) is unknown from that which is generally known.

Turning to item (g),[8] Herley has a sole ownership right in its "Background IP" under the terms of the Teaming Agreement. However, setting ownership aside, the text of item (g) provides this Court no way of determining whether it is a trade secret. Herley fails to identify specific documents or even categories of documents under item (g) that it provided to R3E. As with item (d), Herley's allegations are insufficient to support a finding of which, if any,

---

[6] In reviewing a motion for preliminary injunction in a similar case, the court found that the plaintiff had satisfied its burden of specificity where it "identified precisely which of its engineering drawings, pricing information, and proprietary materials undergird the trade secrets claim, and it explained when and how each document was used by the various defendants." *Advanced Fluid Sys.,* 381 F. Supp. 3d at 386. In fact, the plaintiff in *Advanced Fluid Systems* provided copies of the putative trade secrets to the court, affording the court the opportunity to identify and examine the information and make a determination as to their protectable status. *See id.*

[7] Item (d) states in full "Information regarding the skills and compensation of Herley's employees, contractors and other agents."

[8] Item (g) states in full "Herley's Background Technology provided to R3E in furtherance of the MicroIFF contracts."

documents under the "Background IP" umbrella are generally unknown in the trade. Without any indication of the types of documents referred to by item (g), this Court cannot begin to adjudicate their status as trade secrets.

Therefore, because items (b), (d), and (g) are too vague to undergo a trade secret analysis, they cannot form the foundation for a likelihood of success on the merits.[9]

**2. Items (a), (c), (e), and (f)**

Items (a), (c), (e), and (f) relate directly to the development of Micro-IFF. Assuming, *arguendo*, that these items constitute trade secrets, there is a genuine factual dispute as to whether they have been misappropriated. Misappropriation requires *improper* disclosure or use. *See* 18 U.S.C. § 1839(5)(B); 12 Pa. Stat. § 5302(2) (defining "Misappropriation"). Here, Herley and R3E dispute ownership of the putative trade secrets under the terms of the Teaming Agreement. Herley asserts that it alone developed the Micro-IFF Technology. *See* Gallagher Dec., Pl.'s Reply at Ex. A ¶ 10, ECF No. 23-1. Accordingly, Herley asserts sole ownership over the information, meaning any unauthorized use or disclosure by R3E is improper and therefore misappropriation. *See* Pl.'s Reply 5. In response, R3E quotes from an email that suggests joint ownership over the information, meaning R3E's use or disclosure is not improper and therefore not misappropriation.[10] *See* Def.'s Sur-Reply 5.

---

[9] This Court recognizes Herley's attempt to allege the overarching factors under the DTSA/PUTSA. Herley alleges efforts to keep its intellectual property confidential and secure, including password protected servers and the contractual provisions of the Teaming Agreement. *See* Compl. ¶ 65. Furthermore, Herley has identified that the information is valuable, insofar as it spent $2 million of their own money to develop it. *See id.* at ¶ 95. However, while Herley certainly exerted effort to keep certain valuable information protected, it does not sufficiently identify what that information *is* such that this Court could make a determination as to its trade secret status under the DTSA/PUTSA.

[10] According to R3E, the email from Herley's Micro-IFF lead engineer stated that Herley was reverting to R3E's original Micro-IFF design in order to find "a decent starting point." *See*

14
110520

Notwithstanding, the Court need not resolve the dispute at this time because, as explained below, Herley fails to show that it will suffer irreparable harm in the absence of an injunction.

## B. Irreparable Harm

Herley asserts two arguments in support of its claim of irreparable harm. First, Herley asserts that the Court should honor the terms of Section 14 of the Teaming Agreement, which specifies that a breach of Sections 8 and 9 constitutes irreparable harm per se. Second and alternatively, Herley makes a fact-based case for irreparable harm, arguing the facts warrant a finding of irreparable harm even if this Court does not honor the Teaming Agreement provision. In summary, neither argument nor a combination of both warrant a finding of irreparable harm.

### 1. Teaming Agreement Argument

Section 14 of the Teaming Agreement states in relevant part:

> Each of the Parties hereto acknowledges and agrees that HERLEY's remedy at law for a breach or threatened breach by R3E of the obligations or restrictions imposed upon R3E pursuant to Sections 6, 7, 8, 9, 10, 11 or 12 would be inadequate and, in recognition of that fact, in the event of a breach or threatened breach by R3E of any of the provisions of such Sections, it is agreed that, in addition to its remedy of law, HERLEY shall be entitled to seek, without posting any bond or other security (other than a nominal bond or other nominal security), equitable relief . . . .

*See* Teaming Agreement 6-7.

Herley argues that R3E is in violation of Sections 8 and 9 of the Teaming Agreement by withholding Herley's intellectual property despite Herley's requests for its return. Accordingly, a breach of Sections 8 and 9 falls within the terms of Section 14, providing for equitable relief.

Notwithstanding, parties cannot contract to "create a right to injunctive relief where it would otherwise be inappropriate." *Radian Guar. Inc. v. Bolen*, Civ. A. No. 13-6197, 2014 WL 2777450, at *9 (E.D. Pa. June 19, 2014) (citing *Firemen's Ins. Co. of Newark v. Keating*, 753 F.

---

Def.'s Sur-Reply 5. However, R3E did not attach a copy of the email to its Sur-Reply, relying instead on the affidavit of David Contarino. *See* Contarino Aff. ¶ 19.

Supp. 1146, 1154 (S.D.N.Y. 1990)). Rather, an equitable remedies provision "generally weighs in favor of a finding of irreparable harm by courts within this District." *Radian*, 2014 WL 2777450, at *9 (citing *WebMD Health Corp. v. Dale*, 2012 WL 3263582, at *12 (E.D. Pa. Aug. 10, 2012)). With those principles in mind, this Court treats Section 14 as evidence weighing in favor of a finding of irreparable harm. Nonetheless, this Court must analyze whether a finding of irreparable harm is otherwise appropriate in this case.

### 2. Fact-based Argument

In an effort to show a finding of irreparable harm is otherwise appropriate, Herley states that it "would be at a competitive disadvantage that a legal remedy could not address due to R3E's actual or threatened misappropriation of its IP." Pl.'s Reply 9. Despite its use of common irreparable harm terminology, Herley fails to establish *how* it would be irreparably harmed. Instead, Herley merely alleges that "Herley has suffered and will continue to suffer irreparable harm," Mot. 17, "Herley will be unable to counteract the unfair advantage that R3E gains over it," *id.*, and "Herley has demonstrated irreparable harm here," *id.*

Herley's assertion of irreparable harm is neither clear nor immediate as this Circuit requires. *See Campbell Soup*, 977 F.2d at 91. By failing to show how it will be harmed or what sort of competitive disadvantage it will suffer, Herley has not shown that its injury is incapable of redress by monetary remedies. *See Sampson*, 415 U.S. at 90. Even where a plaintiff claimed its business would "be completely destroyed, its employees and jobs will be lost and its goodwill and business reputation will be ruined," the Third Circuit declined to find irreparable harm where

the facts did not support those assertions. *Instant*, 882 F.2d at 801. Here, Herley has failed to provide any facts that would establish that its harm is irreparable.[11]

Herley cites a series of cases in support of its position. However, the common thread in each of them, and the missing thread here, is that each of the plaintiffs in those cases provided evidence upon which the Court could find irreparable harm. *See Home Line Furniture Indus. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 540 (E.D. Pa. 2009) (stating plaintiff "presented sufficient evidence" to allow the court to find irreparable harm); *Fisher Bioservs. v. Bilcare, Inc.*, 2006 WL 1517382 at *20 (E.D. Pa. May 31, 2006) (noting plaintiff provided email messages that showed the defendant was actively using confidential information to the detriment of plaintiff's goodwill); *Ecolaire Inc. v. Crissman*, 542 F. Supp. 196, 206 (E.D. Pa. 1982) (plaintiff adequately showed that "the value of [plaintiff's] good will and trade secrets cannot be measured in monetary terms"). Unlike each of these cases, Herley has not provided any evidence as to how or why it will suffer a clear and immediate irreparable injury in the absence of the requested injunction. Therefore, Herley has failed to establish irreparable harm.

A failure to establish irreparable harm is fatal to a request for a preliminary injunction. *See Arthur Treacher's*, 689 F.2d at 1143. Additionally, the Court finds a hearing is not required because the movant has failed to present colorable facts to support its claim of irreparable harm. *Bradley*, 910 F.2d at 1175-76.

Thus, the Plaintiff's request for a preliminary injunction is denied without a hearing and without prejudice.

---

[11] In *Instant*, the plaintiff at least provided financial statements and data to the court to support its assertion of irreparable harm. *Instant*, 822 F.2d at 802. The court concluded that the assertion of irreparable harm was not adequately supported by the proffered evidence. *See id.* Here, Herley has not provided any information or data to support its assertions that it will be irreparably harmed in the absence of an injunction.

## V. EXPEDITED DISCOVERY ANALYSIS

Herley fails to show good cause for expedited discovery. All of the factors that this Court is to consider weigh against expedited discovery. First, the motion for expedited discovery was filed only one day after the Complaint. Further, based on the decision of the Court as to the preliminary injunction, there will be no preliminary injunction hearing scheduled. Second, although Herley claims its request is narrow, it reaches most of the merits of this case. Herley seeks leave to depose corporate representatives of R3E, including its CEO. Additionally, Herley requests that this Court order the production of documents, the scope of which covers virtually any matter relating to the Micro-IFF. Given that the contractual relationship began in April of 2016 and allegedly ended sometime in January 2020, this request potentially reaches multiple years' worth of documents. Troublingly, Herley demands those documents be produced within seven days of the signing of the proposed order. In essence, Herley is asking for full discovery one day after filing its Complaint, and it is providing R3E seven days to comply. Finally, the burden on R3E is severe. Herley seeks an order requiring R3E to produce multiple deponents as well as numerous documents prior to adjudication of a pending Motion to Dismiss. Furthermore, the proposed order would only give R3E seven days to comply with the extensive document requests and fourteen days to produce the requested witnesses for deposition.

For these reasons, Herley's request for expedited discovery is denied.

## VI. CONCLUSION

Herley fails to show that it would suffer irreparable harm in the absence of an injunction. A plaintiff's failure to show that it would suffer irreparable harm is fatal to its request for an injunction, and a hearing is unnecessary where the movant fails to present colorable facts to

18
110520

support its assertion of irreparable harm. Therefore, the request for a preliminary injunction is denied without a hearing and without prejudice.

Additionally, Herley has failed to show good cause for expedited discovery. Therefore, Herley's motion for expedited discovery is denied.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge