UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERLEY INDUSTRIES, INC., d/b/a/ ULTRA ELECTRONICS HERLEY v. <br><br> R CUBED ENGINEERING, LLC | : <br> : <br> :   No. 5:20-cv-02888 <br> : <br> : |

**O P I N I O N**
**Partial Motion to Dismiss for Failure to State a Claim, ECF No. 18 – Granted in Part, Denied in Part**

**Joseph F. Leeson, Jr.**                                                                                      January 22, 2021
**United States District Judge**

## I.   INTRODUCTION

Plaintiff Herley Industries, Inc. ("Herley") filed suit against Defendant R Cubed Engineering ("R3E"), stemming from a contractual relationship between the two parties formed for the purpose of developing and selling avionics surveillance equipment. Herley alleged several claims including breach of contract, conversion, and the Defend Trade Secrets Act (DTSA)/Pennsylvania Uniform Trade Secrets Act (PUTSA). R3E filed the present partial Motion to Dismiss for Failure to State a Claim.

R3E's motion to dismiss is granted in part and denied in part. As to Herley's claim of breach of the Teaming Agreement, Count VI, R3E's motion to dismiss is denied. As to Herley's claims of (1) preliminary injunctive relief, Count I; (2) permanent injunctive relief, Count II; (3) violation of the DTSA, Count III; (4) violation of the PUTSA, Count IV; (5) conversion of intellectual property, Count V; and (6) conversion of monies under Purchase Order 5, Count VIII; R3E's motion to dismiss is granted. Counts I, II, and VIII are dismissed with prejudice as a matter of law. Counts III, IV, and V are dismissed without prejudice.

## II.    BACKGROUND[1]

Herley, a developer of flight instrumentation products, and R3E, a developer of aviation surveillance products, entered into a Memorandum of Agreement ("the Memo Agreement") on January 16, 2015.  *See* Compl. ¶¶ 7-8, 12, ECF No. 1.  The Memo Agreement was formed for the purpose of producing a "Micro-Identification – 'Friend or Foe' transponder/receiver" ("Micro-IFF").  *See id.* at ¶¶ 9, 12.  At that time, the U. S. Navy was seeking to purchase the Micro-IFF and had put together a multi-phase plan for procuring the Micro-IFF.  *See id.* at ¶ 9.  Procurement involved three discrete phases, and the bid for Phase I had already been awarded to R3E when R3E and Herley entered into the Memo Agreement.  *See id.* at ¶¶ 10-11.

After the parties entered into the Memo Agreement, R3E submitted its proposal for Phase II of the project to the Navy, listing Herley as the subcontractor, and was awarded the contract on April 18, 2016.  *See id.* at ¶¶ 13-14.  Following the Phase II award, Herley and R3E entered into a "Teaming Agreement," which provided that Herley would do, among other things, the following:

  (i)    support the Phase II proposal;
  (ii)   act as subcontractor in furtherance of the award resulting from the Phase II proposal;
  (iii)  perform the obligations specified for Herley, as subcontractor under any Phase II (or possible Phase III) award for the further development, manufacture, and evaluation of the Micro-IFF; and
  (iv)   manufacture the Micro-IFF to satisfy any contract with the Navy or any other military or any non-military purchaser of the Micro-IFF, whether or not there are any other resultant Program awards.

*Id.* at ¶ 16, Ex. A 1 ("Teaming Agreement").

---

[1]    The background is taken, in its entirety, from allegations contained in Herley's Complaint and documents appropriately appended thereto.

The Teaming Agreement includes several provisions that deal directly with the rights of both parties with respect to confidential information during the term of the agreement and after its termination.  *See id.* at ¶¶ 20-23.  Section 9 states that "HERLEY and R3E shall be co-owners of all inventions, designs, specifications, products and manufacturing processes and procedures and works excluding trademarks ('Intellectual Property Rights') developed jointly by the Parties specifically for the Micro-IFF and related products."  *Id.* at Ex. A 4, ECF No. 1-4.  Accordingly, joint ownership does not extend to technology that is developed independent of the Micro-IFF venture, otherwise known as "Background Technology."  *See id.*  Section 9 defines "Background Technology" as "any technology or related Intellectual Property Rights of either Party developed independent of the Micro-IFF and related products ('Background Technology')."  *Id.*  Finally, Section 9 provides that Herley has the exclusive right to "file and obtain any patents, copyrights, trademarks, or other legal protections" with respect to the Micro-IFF.  *See id.*

Section 8 of the agreement provides further protections for sensitive information.  It defines Confidential Information as "information concerning the designs, products, manufacturing and other processes and procedures, finances and business plans and other non-public information of the other [party] (collectively, 'Confidential Information')."  *Id.*  Section 8 provides that upon termination of the Teaming Agreement, each party upon request "shall deliver to the other Party all Confidential Information acquired from the disclosing Party . . . ."  *Id.*

Reading Sections 8 and 9 together, the Teaming Agreement contemplates that, upon request, each party is owed return of (1) Confidential Information and Background Technology exchanged during the term of the agreement that (2) was not related to the joint development of the Micro-IFF.  These provisions were drafted to survive termination of the agreement.  *See id.*

In addition, Section 14 provides that equitable remedies are available for a breach of Sections 8 and 9. *See id.* at Ex. A 6-7.

Beginning on January 23, 2015, R3E issued four purchase orders to Herley related to the Phase II award with the Navy. *See id.* at ¶ 30. These orders were dated January 23, 2015, May 12, 2016, September 6, 2017, and January 3, 2018. *See id.* Herley completed the work on each order and submitted invoices to R3E for each. *See id.* at ¶ 32. R3E paid all four invoices in full without complaint. *See id.*

Around September 28, 2018, the United States Army awarded a contract for a Modular Data Acquisition System to R3E. *See id.* at ¶ 33. That Data Acquisition System would require the Micro-IFF that the parties were developing. *See id.* at ¶ 34. On October 25, 2018, R3E issued a fifth Purchase Order (PO-5) to Herley, stating that Herley would, "on a best efforts basis," support R3E in its contract with the Army. *See id.* at ¶ 34. PO-5 provided for a total invoice price of $377,092.32, to be paid in seven monthly installments of $53,870.00.[2] *See id.* at ¶ 35. Herley sent all seven invoices to R3E. *See id.* at ¶ 37.

On October 4, 2019, R3E sent Herley a "Notice of Non Performance and Breach" under the terms of the Teaming Agreement. *See id.* at ¶ 40. Thereafter, on January 3, 2020, R3E sent a letter to Herley stating that the Teaming Agreement had been terminated for the reasons specified in the October 4 Notice. *See id.* at ¶ 43.

Following the termination of the agreement, PO-5 remained partially unpaid to Herley. *See id.* at ¶ 52. Herley has only received payment for the first three invoices in the amount of $161,610.00 and is owed $215,480.00 for the outstanding four invoices. *See id.* at ¶ 53. In a

---

[2]   According to Herley, the final invoice was for $53,872.32, which makes up the missing $2.32 between the installments and the total purchase order price. *See* Compl. ¶ 35 n.1.

letter dated March 2, 2020, R3E told Herley that the Army rejected one invoice for nonperformance and instructed R3E to not submit any additional invoices on account of the work being insufficient. *See id.* at Ex. D. R3E also stated in the letter that no portion of the remaining funds from PO-5, invoices four through seven, had been received by R3E. *See id.* Herley requested information from the Army Contracting Officer as to the disposition of the funds. *See id.* at ¶¶ 59-60. On June 5, 2020, the Contracting Officer responded, stating that R3E submitted five of the seven invoices to the Army for Payment. *See id.* at ¶ 60.

R3E remains in possession of Herley's IP. *See id.* at ¶ 64. On May 1, 2020, Herley sent a letter to R3E demanding return of all IP pursuant to those sections of the Teaming Agreement that were to remain in effect after termination. *See id.* at ¶ 70. Herley sent a second demand letter on May 6, 2020. *See id.* at ¶ 71. On May 10, 2020 R3E responded, stating that the IP was subject to "joint ownership" and was already in the "public domain." *See id.* at ¶ 62. Herley sent a final demand on May 18, 2020, which R3E acknowledged receipt of by email, but to which R3E did not respond substantively. *See id.* at ¶ 74. Due to R3E's refusals, Herley seeks the return of the following:

> (a) Engineering plans, drawings, designs and formulas relating to the Micro-IFF and the development of any prototypes of the Micro-IFF including, but not limited to, receiver architecture to address noise figure and channel to channel isolation;
> (b) Trade secrets, inventions, ideas, processes, computer source and object code, formulae, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs, and techniques;
> (c) Information regarding the Micro-IFF or other products, business plans, budgets, financial statements, contracts, prices, supplier and customers;
> (d) Information regarding the skills and compensation of Herley's employees, contractors and other agents;
> (e) All 45TS and Mode test data identified in Attachment A to Exhibit F and provided to R3E on March 27, 2019 as well as all derivative work made from the March 2019 Prototype Tests data;
> (f) All documents and information at any time shared regarding the prototype demonstrated to R3E during the week of March 24-31, 2019 by Herley;

    (g) Herley's Background Technology provided to R3E in furtherance of the MicroIFF contracts.

*See id.* at ¶ 78.

In its Complaint, Herley asserts nine separate counts against R3E:

(1) Preliminary Injunctive Relief;

(2) Permanent Injunctive Relief;

(3) Violation of the DTSA;

(4) Violation of the PUTSA;

(5) Conversion of IP;

(6) Breach of the Teaming Agreement;

(7) Breach of Purchase Order 5;

(8) Conversion of Monies under Purchase Order 5; and

(9) Unjust Enrichment.

In its motion, R3E seeks dismissal of all Counts except Counts 7 and 9.

## III.    LEGAL STANDARDS

### A. Law Governing Motions to Dismiss for Failure to State a Claim

In rendering a decision on a motion to dismiss, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."


*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").  The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted.  *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### B. Law Governing DTSA & PUTSA Claims

The DTSA provides the owner of a trade secret a remedy when that trade secret is misappropriated.  *See* 18 U.S.C. 1836(b)(1).  In order to make out a claim under the DTSA, a plaintiff must show (1) that they own a trade secret and (2) that the defendant misappropriated the trade secret.  *See Teva Pharmas. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 674 (E.D. Pa. 2018).  Similarly, the PUTSA provides injunctive relief for the "actual or threatened misappropriation" of trade secrets.  *See* 12 Pa. Stat. § 5303.

Both the DTSA and PUTSA define "trade secret" similarly, providing four factors for putative trade secrets to be evaluated against:

(1) The owner used "reasonable means" to keep the information secret;

(2) The information derives actual or potential "independent economic value" from being secret;

(3) The information is not "readily ascertainable by proper means"; and

(4) Others, who cannot access the information, would derive "economic value from its disclosure or use."

*See Teva Pharmas.*, 291 F. Supp. 3d at 675 (citing 18 U.S.C. § 1839(3)).

A plaintiff must identify the trade secret with enough particularity "as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade." *See Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 386 (M.D. Pa. 2019) (citing *Synygy, Inc. v. ZS Assocs.*, No. 07-3536, 2013 WL 3716518, at *2 (E.D. Pa. July 15, 2013); *Dow Chem. Can., Inc. v. HRD Corp.*, 909 F. Supp. 2d 340 (D. Del. 2012)). Generally, "vague references to products and information will not suffice." *See id.* (citing *Synygy*, 2013 WL 3716518, at *2).

In addition to alleging the existence of a trade secret, the claimant must also allege that the trade secret was misappropriated. The standard for "misappropriation" applicable to the present case is identical under both the DTSA and PUTSA. *See* 18 U.S.C. § 1839(5)(B); 12 Pa. Stat. § 5302(2) (defining "Misappropriation"). Both define misappropriation as including "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(B); 12 Pa. Stat. § 5302(2) (defining "Misappropriation").

## C. Law Governing Conversion Claims

Herley alleges two types of conversion in its Complaint: (1) Conversion of a trade secret and (2) conversion of monies. To state a claim for conversion of a trade secret, a plaintiff must allege that:

(1) "it owns a trade secret;"

(2) the "trade secret was communicated to the defendant within a confidential relationship;" and

(3) the "defendant used the trade secret to the plaintiff's detriment."

*Teva Pharmas.*, 291 F. Supp. 3d at 680 (citing *Am. Hearing Aid Assocs. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 705 (E.D. Pa. 2004)).

Conversion of monies is reviewed under the Pennsylvania common law standard of conversion. "Conversion is defined under Pennsylvania law as 'the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification.'" *Wen v. Willis*, 117 F. Supp. 3d 673, 684 (E.D. Pa. 2015) (quoting *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012)). "Money may be the subject of conversion only where the plaintiff had a property interest in the money at the time of the alleged conversion." *See id.* (quoting *Kia v. Imaging Scis. Int'l, Inc.*, 735 F. Supp. 2d 256, 270 (E.D. Pa. 2010)).

### D. Law Governing Breach of Contract Claims

A breach of contract claim under Pennsylvania law requires the claimant to show three elements:

(1) "the existence of a contract, including its essential terms;"

(2) "a breach of a duty imposed by the contract;" and

(3) "resultant damages."

*Udodi v. Stern*, 438 F. Supp. 3d 293, 299 (E.D. Pa. 2020) (quoting *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)).

### E. The Gist of the Action Doctrine

"The gist of the action doctrine 'precludes plaintiffs from recasting ordinary breach of contract claims into tort claims.'" *Kimberton Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc.*, Civ. A. No. 11-4568, 2011 WL 6046923, at *6 (E.D. Pa. Dec. 6, 2011)

(citing *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 123 (3d Cir. 2010)).[3] The doctrine bars a plaintiff from bringing tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

*See Integrated Waste Sols., Inc. v. Goverdhanam*, Civ. A. No. 10-2155, 2010 WL 4910176, at *10 (E.D. Pa. Nov. 30, 2010) (citing *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 19 (Pa. Super. Ct. 2002)). In the context of a conversion claim, courts have dismissed such claims under the gist of the action doctrine "where the alleged entitlement to the chattel arises solely from the contract between the parties." *See Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 622 (E.D. Pa. 2010) (citing *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 777 (M.D. Pa. 2008)).

Courts are permitted to apply the doctrine at the pleading stage "to dismiss what are in reality contract claims, with prejudice." *Reginella Const. Co. v. Travelers Cas. & Sur. Co. of Am.*, 971 F. Supp. 2d 470, 475 (W.D. Pa. 2013), *aff'd sub nom.*, 568 F. App'x 174 (3d Cir. 2014). Additionally, a court may raise the gist of the action doctrine sua sponte. *See id.*

---

[3] A similar doctrine, the economic loss doctrine, "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract." *Kimberton*, 2011 WL 6046923, at *7 (citing *Lewinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002)). "The Third Circuit has predicted that the Pennsylvania Supreme Court would adopt both the gist of the action and the economic loss doctrines." *See id.* (citing, *inter alia*, *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 548 (3d Cir. 2010)). Notwithstanding, the gist of the action doctrine is "'a better fit' for non-products liability cases" like the present case. *See id.* (citing *Pediatrix*, 602 F.3d at 554 n.5) (noting applicability of gist of action doctrine to conversion claim). Accordingly, this Court applies the gist of the action doctrine to Herley's conversion claims.

## IV. DISCUSSION

### A. Preliminary & Permanent Injunction Claims – Counts I and II

In its Complaint, Herley alleges separate Counts entitled "Preliminary Injunctive Relief," Count I, and "Permanent Injunctive Relief," Count II. In response, R3E argues for dismissal of these claims, applying a traditional injunction analysis. Notwithstanding Herley's allegations and R3E's application of a traditional injunction analysis, preliminary and permanent injunctions are a form of relief, not a claim to be pleaded as a separate count. *In re Shop-Vac Mktg. & Sales Practices Litig.*, 964 F. Supp. 2d 355, 365 (M.D. Pa. 2013) ("[I]njunctive relief is a remedy, not an independent cause of action.").

Therefore, Counts I and II are dismissed with prejudice as a matter of law.[4]

### B. DTSA/PUTSA Claims – Counts III and IV

#### 1. Trade Secret

To plead a claim under the DTSA or PUTSA, Herley must first make out a trade secret. In an effort to do so, Herley provides a list of information that it alleges are its trade secrets. *See* Compl. at ¶ 78. As to some items, Herley's allegations are insufficient to make out a trade secret. Notwithstanding, Herley has alleged at least some protectable trade secrets sufficient to withstand a motion to dismiss.

As an example of those allegations insufficient to make out a trade secret, Herley claims in item (d) that "[i]nformation regarding the skills and compensation of Herley's employees, contractors and other agents" is protectable as a trade secret. However, without more, Herley has not alleged a trade secret in item (d). *See Advanced Fluid Sys.*, 381 F. Supp. 3d at 386 (noting

---

[4] The Court offers no opinion at this time on the merits or appropriateness of any injunctive relief that Herley seeks with respect to its other claims.

vague references to information are insufficient (citing *Synygy, Inc*, 2013 WL 3716518, at *2)). Part of what makes a trade secret distinguishable from other information is the degree to which the information is otherwise generally known within in the trade. *See Advanced Fluid Sys.*, 381 F. Supp. 3d at 386. As to item (d), Herley makes no effort to allege that the information regarding its employees is *entirely* unknown to *any* member of the industry or how this Court should go about separating what portion of item (d) is unknown to the industry from that which is generally known. In addition, Herley does not allege any steps taken to protect this category of information or that this particular information would be of value to its competitors.[5] Therefore, Herley has not sufficiently alleged a trade secret with respect to item (d).

As a counterexample, Herley claims in item (a) that it is owed return of "Engineering plans, drawings, designs and formulas relating to the Micro-IFF and the development of any prototypes of the Micro-IFF including, but not limited to, receiver architecture to address noise figure and channel to channel isolation." *See* Compl. ¶ 78. In addition, Herley alleges that it took steps to protect this intellectual property. *See id.* at ¶ 65. Namely, Herley stored this information in password-protected files. *See id.* Furthermore, Herley alleges that it invested millions of dollars to develop this technology. *See id.* at ¶ 96.

As a result of the expense required to develop the technology and the steps taken to protect it, Herley alleges that the technology listed in item (a) is not readily discoverable by or known to the public. *See* Compl. ¶ 110(e). Furthermore, Herley alleges that this information would be valuable to Herley's competitors. *See id.* at ¶ 110(f). This allegation is supported by

---

[5] Herley alleges that its Micro-IFF "methods and designs" are generally unknown to the public, including allegations that speak to the time and effort expended to keep these methods and designs protected. *See* Compl. ¶ 110. Notwithstanding, these allegations do not reach item (d), which is facially unrelated to designs or methods involved in the development of the Micro-IFF.

the value of the contracts Herley was awarded related to the Micro-IFF development. *See id.* at ¶ 30. Therefore, Herley has sufficiently alleged a trade secret with respect to the information in item (a).

Because Herley has sufficiently alleged at least one trade secret, the Court must determine whether Herley has sufficiently alleged misappropriation.

### 2. Misappropriation

Herley must next allege that R3E misappropriated the trade secret identified in item (a). Misappropriation requires improper disclosure or use. *See* 18 U.S.C. § 1839(5)(B); 12 Pa. Stat. § 5302(2) (defining "Misappropriation"). Even taking the allegations as true for the purpose of this motion, Herley fails to allege such misappropriation.

Herley generally alleges that R3E has used or disclosed Herley's trade secrets. *See id.* at ¶ 64 ("R3E is improperly usurping Herley's IP to further its own interest and try to meet its obligations under the Navy SBIR Contracts and Army RIF Contracts."); *id.* at ¶ 72 ("R3E not only refused to return Herley's IP, but claimed that any such IP was subject to 'joint ownership' and already placed in the 'public domain.'"). Herley maintains that these general allegations are sufficient to make out misappropriation. *See* Resp. 22. In support, Herley cites to two cases in which it claims general allegations of misappropriation sufficed to survive a motion to dismiss.

However, a closer review of those cases shows that the allegations of misappropriation were not as general as Herley portrays them. Indeed, in *123 Exteriors*, the plaintiff included general allegations of misappropriation similar to Herley's allegations here. *See 123 Exteriors, Inc. v. N. Star Exteriors*, LLC, Civ. A. No. 17-4337, 2018 WL 3642221, at *7 (E.D. Pa. Aug. 1, 2018) ("Defendants have used and continue to use the Confidential/Proprietary Information and trade secrets without Plaintiff's consent"). Notwithstanding, the complaint in *123 Exteriors* also

details that the defendant-employee actively used plaintiff-employer's trade secrets. *See id.* at *3 ("Defendant Hopkins had formed an exterior restoration business and was actively competing against [p]laintiff. . . . [p]laintiff then discovered that [d]efendant Hopkins . . . had placed signs for his directly competitive business . . . in the yards of [p]laintiff's actual customers . . . ."). The same is true for *PDC Machines Inc.*, the other case on which Herley principally relies. *See PDC Machines Inc. v. Nel Hydrogen A/S*, Civ. A No. 17-5399, 2018 WL 3008531, at *4 (E.D. Pa. June 18, 2018) (noting specific allegations that defendant filed an international patent application for a product developed by plaintiff). These factual allegations colored the plaintiff's general claims of misappropriation. Herley, on the other hand, has not alleged specific facts. Although Herley makes general allegations as to "use" or "disclosure," it does not support those conclusions with factual allegations.

Herley's allegations fail to state a claim for misappropriation of trade secrets under either the improper disclosure or improper use elements of the DTSA and PTSA. Therefore, because Herley fails to sufficiently allege misappropriation of those trade secrets, R3E's motion to dismiss Herley's DTSA and PUTSA claims is granted.

## C. Conversion Claims – Counts V and VIII

In its Complaint, Herley alleges two forms of conversion. First, in Count V, Herley alleges that R3E converted its intellectual property. Second, in Count VIII, Herley claims that R3E converted monies owed to Herley under PO5. R3E's motion to dismiss is granted with respect to both counts. Each claim is discussed in turn below.

### 1. Conversion as to Herley's Intellectual Property – Count V

In support of dismissal of Count V, R3E lodges two arguments. First, R3E argues that Herley fails to allege the elements of conversion of intellectual property. Second, and

alternatively, R3E argues that Herley's conversion claim may be preempted by its PUTSA claim. Here, Herley fails to set forth the elements required for a claim of conversion of intellectual property.

To state a claim for conversion of intellectual property, Herley must plead (1) ownership of a trade secret, (2) that was communicated to R3E in a confidential relationship, and (3) that R3E used that secret to Herley's detriment. *See Teva Pharmas.*, 291 F. Supp. 3d at 680 (citing *Am. Hearing Aid Assocs.*, 309 F. Supp. 2d at 705). Although Herley pleads the first two elements, it fails to plead the third.

The Court noted in Section IV.B.1, *supra*, that Herley sufficiently alleged at least one trade secret. In addition, Herley alleges that it communicated these trade secrets to R3E as part of a confidential relationship. Specifically, Herley alleges that it and R3E were engaged in a contractual relationship that anticipated and prepared for the exchange of confidential information between the parties. *See* Compl. ¶¶ 19, 22.

However, Herley fails to sufficiently allege that R3E is using its trade secrets. As noted above in Section IV.B.2, Herley merely alleges, in conclusory fashion, that R3E is "using" Herley's trade secrets. *See id.* at ¶¶ 64, 72. Herley makes no effort to set forth *how* R3E is using these trade secrets. Without more, Herley has failed to sufficiently make out a claim for conversion of intellectual property.[6]

---

[6] Because Herley has failed to allege the elements of a claim of conversion of intellectual property, the Court does not address the applicability of either PUTSA preemption or the gist of the action doctrine at this time. Nevertheless, it appears that review of any PUTSA preemption or gist of the action doctrine applicability to this conversion claim would be premature at this stage of the litigation. *See Kimberton*, 2011 WL 6046923, at *8 (declining to apply gist of the action where it is unclear whether "the common law or statutory prohibition against misappropriation will address a broader scope of [plaintiff's] secrets or greater duties than the contract obligation" (quoting *Orthovita, Inc. v. Erbe*, No. 07-cv-2395, 2008 WL 423446, at *5 (E.D. Pa. Feb. 14, 2008))); *Hecht v. BabyAge.com, Inc.*, No. 3:10–CV–724, 2010 WL 3940882,

### 2.     Conversion of Monies Under Purchase Order 5 – Count VIII

Herley claims, in Count VIII, that R3E converted monies owed to Herley under PO5. R3E states that the conversion claim should be dismissed because Herley was not in privity with the Army. Notwithstanding this argument, the gist of the action doctrine requires dismissal of Herley's conversion claim in Count VIII.

The entirety of Herley's entitlement to the monies under PO5 arises solely from a contract between it and R3E, namely PO5. *See Brown & Brown*, 745 F. Supp. 2d at 622. Indeed, Herley's allegations in Count VIII reference the very contract under which it claims the money is owed. Absent PO5, Herley would have no entitlement to these proceeds. Put another way, there is no "social policy" that would entitle Herley to the unpaid invoices. *See id.* at 623. Therefore, the gist of the action doctrine bars Herley from attempting to recast the breach of PO5 claim as a tort claim.

### D.  Breach of Teaming Agreement -- Count VI

In its motion, R3E asserts that Herley fails to allege a breach of contract claim as to the Teaming Agreement. Specifically, R3E moves to dismiss this claim because it asserts that Herley fails to plead damages resultant from any breach.

Notwithstanding, the allegations being taken as true, Herley pleads sufficient damages to sustain a breach of contract action. Indeed, Herley asserts in Count VI that "[u]nder the Teaming Agreement R3E was required to fund Herley in the development, manufacture, and evaluation of the Micro-IFF." *See* Compl. ¶ 138. Additionally, the parties agreed that the Teaming

---

at *5 (M.D. Pa. Oct. 6, 2010) (declining to apply PUTSA preemption prior to discovery on whether information to be protected constitutes a trade secret).

Agreement would have effect for thirteen years. *See id.* at ¶ 139. Furthermore, Herley was to have the exclusive right to manufacture the Micro-IFF. *See id.* at ¶ 21.

Herley's allegations sufficiently plead damages. Under the terms of the agreement, Herley was to have the financial support of R3E for a period of thirteen years in developing and manufacturing the Micro-IFF. Due to the alleged breach of the Teaming Agreement, Herley did not receive such support as promised.

R3E argues that any payments owed to Herley are governed by Purchase Order 5, and therefore, Count VI is duplicative of Herley's claim for Breach of Contract as to Purchase Order 5 (Count VII). *See* Mot. 30. However, this reading of Count VI is too narrow, especially in light of the standard of review on a motion to dismiss. Herley does not exclusively allege that R3E's breach of the Teaming Agreement involves the amounts owed under Purchase Order 5. Rather, Herley alleges that its damages from the breach of the Teaming Agreement include the early termination of a contractual relationship and financial support that it had every reason to expect would last for thirteen years.

Therefore, Herley sufficiently pleads damages with respect to Count VI, and R3E's motion to dismiss this Count is denied.

**V.      CONCLUSION**

R3E's motion is granted in part and denied in part. As to Herley's claim of breach of the Teaming Agreement, Count VI, R3E's motion to dismiss is denied. In addition to this surviving claim, Herley's claims for breach of Purchase Order 5, Count VII, and Unjust Enrichment, Count IX, also remain in the case, as R3E did not move to dismiss these claims.

As to Herley's claims of (1) preliminary injunctive relief, Count I; (2) permanent injunctive relief, Count II; (3) violation of the DTSA, Count III; (4) violation of the PUTSA,

Count IV; (5) conversion of intellectual property, Count V; and (6) conversion of monies under Purchase Order 5, Count VIII; R3E's motion to dismiss is granted.

Because Counts I, II, and VIII fail as a matter of law, any amendment on those Counts would be futile. *See Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile"). These claims are dismissed with prejudice. Nonetheless, the Court cannot say at this time that amendment would be futile as to Counts III, IV, and V. Therefore, these three counts are dismissed without prejudice. Herley is granted leave to file an amended complaint as to only those claims dismissed without prejudice.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge